Kyle W. Parker, ABA No. 9212124
Jonathan W. Katchen, ABA No. 0411111
CROWELL & MORING LLP
1029 West 3rd Avenue, Suite 550
Anchorage, Alaska 99501
Telephone: (907) 865-2600
Facsimile: (907) 865-2680
kparker@crowell.com
jkatchen@crowell.com

Richard E. Schwartz, *Pro Hac Vice* application pending
John C. Martin, *Pro Hac Vice* application pending
Susan M. Mathiascheck, *Pro Hac Vice* application pending
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
rschwartz@crowell.com
jmartin@crowell.com
smathiascheck@crowell.com

*Attorneys for Plaintiff Pebble Limited Partnership*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PEBBLE LIMITED PARTNERSHIP,<br><br>        **Plaintiff,**<br><br>vs.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and DENNIS J. MCLERRAN, in his official capacity as Regional Administrator of EPA Region 10,<br><br>        **Defendants.** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** (33 U.S.C. § 1344; Pub. L. No. 85-508; Pub. L. No. 94-204)<br><br>**CIVIL ACTION NO.:**<br>_____ |

## INTRODUCTION

1.      Plaintiff Pebble Limited Partnership ("Pebble Partnership") seeks declaratory and injunctive relief against Defendants United States Environmental Protection Agency ("EPA") and Dennis J. McLerran, Regional Administrator, EPA Region 10, for violating federal law. Plaintiff brings this civil action under Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and seeks judicial review of EPA's final decision to conduct a veto proceeding under Section 404(c) of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(c), for the specification of waters within the Bristol Bay watershed as a disposal site for the discharge of dredged or fill material "associated with mining the Pebble deposit."[1]  EPA's decision to conduct a veto proceeding—in the absence of a permit application that the Corps has reviewed—exceeds EPA's authority under the CWA.  EPA's action is also contrary to the Alaska Statehood Act, the Cook Inlet Exchange legislation, and other federal law.

2.      Plaintiff challenges EPA's authority to conduct a veto proceeding that prevents the U.S. Army Corps of Engineers (the "Corps") and the State of Alaska from fully analyzing environmental impacts and permitting issues pertaining to a potential Pebble mine.  During a Section 404 permit process, the Corps and the State evaluate a permit application for the purpose of avoiding unnecessary discharges, minimizing adverse impacts and offsetting environmental losses.  The Section 404 process also requires an environmental impact statement ("EIS") that fully evaluates alternative approaches to a mine project, assesses the alternatives' comparative environmental impacts, and evaluates potential mitigation measures.  This multi-year process

---

[1] Letter from Dennis J. McLerran, Regional Administrator, to Mr. Thomas Collier, Mr. Joe Balash, and Colonel Christopher D. Lestochi (February 28, 2014).  Ex. 1.

would be required before the issuance of a CWA Section 404 permit to dispose of fill material from mining the Pebble deposit. Claiming authority under CWA Section 404(c), EPA is conducting veto proceedings before any of this analysis has been done and even before anyone has applied for a permit. The text and legislative history of the CWA show that the statute does not authorize EPA to veto a permit that has not been sought.

3. In 1979 EPA issued a regulation, 40 C.F.R. §231.1(a), claiming EPA authority to veto a Section 404 permit even in the absence of an application submitted to the Corps. The Clean Water Act, however, provides no authority for EPA to preempt the permitting process on the expectation that someone, someday, might submit an application that results in a permit whose scope and protections the Agency might find "unacceptable." Not surprisingly, for the next 35 years after EPA issued this regulation, EPA never ventured to implement this "sentence first—verdict afterward"[2] approach, so the legality of the regulation has never been tested. On February 28, 2014, EPA applied this regulation, announcing a proceeding to preemptively veto a Section 404 permit for disposal of fill material from a mining operation that has never been proposed, much less evaluated by the federal and state agencies charged with conducting an evaluation of such permit applications. This unprecedented action, if allowed to proceed, will prevent the Corps and the State from evaluating the environmental impacts of an *actual* mining proposal for the Pebble deposit before EPA makes a veto decision based on a *hypothetical* mining operation of EPA's own creation.

_____

[2] *See* Lewis Carroll, *Alice in Wonderland*, Ch. 12 "Alice's Evidence." New York: MacMillan (1865).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. U.S. EPA, Case No. 3:14-cv-_____*
Page 3 of 26

Case 3:14-cv-00097-HRH   Document 1   Filed 05/21/14   Page 3 of 26

4. The Pebble deposit is located on land that the United States granted to the State of Alaska pursuant to federal statutes that expressly convey "mineral deposits," and reserve to the State "all the minerals" and the "right" to lease these lands. *See* Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958). Undertaking veto proceedings for a potential Section 404 permit "associated with mining the Pebble deposit" without the benefit of a permit application or the mandated environmental analyses would amount to revocation by a federal agency of rights to lands that Alaska obtained from Congress in exchange (the Cook Inlet Exchange, described below) for giving other valuable lands to the federal government.

5. Pebble Partnership respectfully submits that, as applied to the Pebble property, EPA's regulation purportedly authorizing a veto outside the permitting process, 40 C.F.R. § 231.1(a), is contrary to law because:

    a. EPA has exceeded its statutory authority under Section 404 by conducting a veto proceeding that is independent of a permit application; and

    b. EPA has violated federal law by conducting a veto proceeding to revoke Alaska's right under the Statehood Act to control mineral development on this land. The action also violates the Cook Inlet Exchange legislation (codified at Pub. L. No. 94-204) under which Alaska relinquished lands desired by the federal government in return for (among other lands) the Pebble property, which the federal government expressly made available for mineral development.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and the APA, 5 U.S.C. § 702 (judicial review of final agency action).

7.      This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706 (judicial review of agency action), for EPA's violations of the Alaska Statehood Act, Pub. L. No. 94-204 (the Cook Inlet Exchange legislation), and the CWA, 33 U.S.C. § 1251, *et seq.*

8.      Venue is proper in this district because (i) a substantial part of the events or omissions giving rise to the claim occurred in Alaska, (ii) the property that is the subject of the action—the area of the Pebble deposit and Pebble Partnership's mineral rights— is located in Alaska, and (iii) the Pebble Limited Partnership resides in Anchorage, Alaska. *See* 28 U.S.C. §§ 1391(e)(1).

## PARTIES

9.      Pebble Partnership, which is based in Anchorage, Alaska, has standing to bring this action. Pebble Partnership holds the mineral claims that comprise the Pebble deposit, and has invested more than $500 million in studies to inform the design of possible mining activities at the Pebble deposit. EPA's 404(c) veto proceeding immediately prohibits the Corps from issuing a permit under Section 404 specifying any land in the area of the Pebble deposit as a CWA disposal site. EPA's veto proceeding will prevent Pebble Partnership from obtaining a CWA Section 404 permit from the Corps to discharge dredged or fill material in connection with a future mine until the proceeding is judicially vacated or EPA has concluded the proceeding. Without that permit, mining cannot begin.

10.     Defendant EPA is an agency of the United States government. EPA promulgated and is applying the Section 404(c) veto regulation challenged in this proceeding.

11.     Defendant Dennis J. McLerran is the Regional Administrator of EPA Region 10. Region 10 administers EPA programs in Alaska and is headquartered in Seattle, Washington.

On February 28, 2014, Defendant McLerran sent a letter, under the authority of the EPA regulation challenged here, to Pebble Partnership, the Corps, and the State of Alaska, announcing EPA's decision to undertake the Section 404(c) veto proceeding for discharges of dredged or fill material associated with mining the Pebble deposit. Defendant McLerran is sued in his official capacity.

## STATUTORY & REGULATORY BACKGROUND

12.     This action is based on: (a) the statutes through which the federal government conveyed land to the State of Alaska; and (b) the Clean Water Act.

## I.     Alaska Statehood Act

13.     Congress passed the Alaska Statehood Act in 1958. *See* Pub. L. No. 85-508, 72 Stat. 339 ("Statehood Act" or "the Act"). Among other things, the Statehood Act created a process by which the State of Alaska could select lands from the federal government to be transferred to the State.

14.     Congress conveyed these lands to ensure the economic and social well-being of Alaska. The legislative history of the Statehood Act reflects widespread concern for Alaska's economic ability to support a state government in light of the State's small population and the fact that the federal government had already reserved for itself much of the most valuable land within Alaska. Thus, the Statehood Act allowed Alaska to retain the rights to selected lands' mineral resources in order to generate revenue to fund a state government. One Senate Report noted that the Senate Committee on Interior and Insular Affairs "felt obligated to broaden the right of selection so as to give the State at least an opportunity to select lands containing real values, instead of millions of acres of barren tundra. To attain this result, the State is given the

right to select lands known or believed to be mineral in character." S. Rep. No. 1028, 83rd Cong., 2d Sess. 6 (1954).

15.     The Statehood Act reserves to the State all subsurface mineral rights in lands conveyed to Alaska by the federal government. Specifically, Alaska was "entitled to select, within twenty-five years after [its] admission . . . into the Union, [approximately 103 million acres] from the public lands of the United States, which are vacant, unappropriated, and unreserved at the time of their selection[.]" Statehood Act § 6(b).

16.     The Act plainly describes the economic purpose of these land grants. Among other things, the Act declares that "[a]ll grants made or confirmed under this Act shall include mineral deposits." *Id.* § 6(i). Congress made these land grants to Alaska "upon the express condition that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain reservation to the State of all the minerals in the lands so sold, granted, or patented, together with the right to prospect for, mine, and remove the same." *Id.* Congress further emphasized that "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct[.]" *Id.*

## II.     Alaska Native Claims Settlement Act

17.     Over the decade following passage of the Statehood Act, pressure mounted for the federal government to find some way to resolve disputes over land claims by Native groups dissatisfied with their land selection options, including options within the Cook Inlet region. In 1971, in part to resolve these claims, Congress passed the Alaska Native Claims Settlement Act ("ANCSA"). ANCSA called for the organization of for-profit Native village corporations and Native regional corporations which would receive the benefit of new land entitlements. One of the Native regional corporations established was Cook Inlet Region, Incorporated ("CIRI").

18.     Section 22(f) of ANCSA authorized exchanges between the Native corporations, the federal government, and the State, to resolve land issues. 43 U.S.C. § 1621(f). In addition, Section 17 of ANCSA authorized the federal government to withdraw 80 million acres of unreserved public lands for conservation purposes, including designation as national parks or wildlife refuges. 43 U.S.C. § 1616(d)(2). In fact, the federal government exercised its withdrawal authority under ANCSA and set aside certain lands in the Pebble deposit area. *See* Public Land Order 5179, 37 Fed. Reg. 5579, 5580 (Mar. 16, 1972); Public Land Order 5250, 37 Fed. Reg. 18730, 18731 (Sept. 15, 1972).

## III.     Cook Inlet Exchange

19.     The United States conveyed to Alaska the land on which Pebble Partnership's mining claims are located under the terms of a land exchange that was memorialized in a document entitled "Terms and Conditions for Land Consolidation and Management in Cook Inlet Area" (herein, the "Cook Inlet Exchange"). The federal government, the State of Alaska, and Native groups entered into the Cook Inlet Exchange in order to resolve conflicts surrounding the claims of Native corporations under ANCSA. Congress later ratified the terms of the Cook Inlet Exchange as part of an amendment to ANCSA. *See* Pub. L. No. 94-204, 89 Stat. 1145 (1976).

20.     The bargain that became the Cook Inlet Exchange addressed the divergent interests of the federal government, Alaska Natives, and the State. CIRI, representing the area's Natives, sought more valuable land selections than those previously available under the Statehood Act and ANCSA. Meanwhile, the federal government wanted to consolidate its holdings for creation of a future Lake Clark Preserve. The State of Alaska sought additional state lands in return for those it would forfeit in order to satisfy Native claims. In the course of

the exchange negotiations, the State pursued valuable land in the Bristol Bay region.  In exchange for the federal government's withdrawal of the entire Lake Clark Preserve area, the State hoped to receive land with significant resource value.

21.     The 1976 Cook Inlet Exchange resolved these competing interests.  The State relinquished lands that it had previously acquired under the Statehood Act to the federal government for reconveyance to CIRI.  These lands that the State relinquished are rich in mineral resources.  In return, CIRI gave up its inholdings in the Lake Clark area, allowing the federal government to consolidate its holdings in that area for what ultimately became the Lake Clark Preserve.  For its part, the federal government forfeited its interest in some previously withdrawn lands in the Bristol Bay watershed and allowed the State to select them pursuant to Section 6 of the Statehood Act.  Under this exchange, the State ultimately chose lands that included the area of the Pebble deposit and much of the surrounding area.  The mineral potential of this area was one of the factors driving the State's selections.

22.     The amendment to ANCSA through which Congress ratified the Cook Inlet Exchange recognizes that Congress was conveying mineral rights.  The ANCSA amendment specified that all lands granted under the Exchange "shall be regarded for all purposes as if conveyed to the State under and pursuant to Section 6 of the Alaska Statehood Act."  43 U.S.C. § 1611 (note).  Thus, for the lands on which the Pebble claims are located, "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct," and the State is free to use those mineral lands to generate revenue.  Statehood Act, § 6(i).

23.     Congress held a series of congressional hearings in 1975 and 1976 on the Cook Inlet Exchange amendment and related legislation.  From the start, the Exchange was envisioned

as a *quid pro quo*, whereby the State would be entitled to the full benefit of the selected lands received in exchange for relinquishing other lands. This legislative history also reflects the State's abiding interest in the mineral potential of the land to be received under the trade.

## IV.   Clean Water Act Section 404

24.     The CWA prohibits the discharge of any pollutant into a water of the United States without a permit. *See* 33 U.S.C. § 1311(a). Discharges of "dredged or fill material," however, may be authorized by a permit issued under Section 404 of the CWA. *See* 33 U.S.C. § 1344.[3]

25.     The Clean Water Act is intended to "preserve, and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution, to plan the development and use . . . of land and water resources . . . ." CWA § 101(b), 33 U.S.C. § 1251(b). In addition, except to the extent expressly provided otherwise, the Clean Water Act is not to "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters . . . of such States." 33 U.S.C. § 1370(2).

26.     The Supreme Court has repeatedly recognized that "[r]egulation of land use, as through the issuance of development permits . . . is a quintessential state and local power . . . .We ordinarily expect a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos v. U.S.,* 547 U.S. 715, 738 (2006) (citations omitted).

---

[3] Discharges of pollutants other than dredged or fill material may be authorized by a permit issued under Section 402 of the CWA. *See* 33 U.S.C. § 1342. The EPA decision challenged here implicates CWA Section 404 only.

27.     Thus, without an "express" provision or a "clear and manifest" statement in the Clean Water Act, EPA has no regulatory authority over waters. Here, nothing in Section 404 of the Act or elsewhere in the statute suggests that Congress intended for EPA to arrogate to itself an authority that essentially bans an activity—mining—before it is even proposed by an applicant. The responsibility for this form of land use planning remains with the State of Alaska.

28.     In this instance, Congress has spoken as to the State's authority and, through the Statehood Act and the Lake Clark Exchange, expressly authorized the State to develop the land's mineral potential. Nothing in Section 404 or any other provision of the Clean Water Act divests Alaska of its authority to determine the use of these State lands.

**A.    The Corps Has Exclusive Authority To Specify Disposal Sites and To Issue Section 404 Permits.**

29.     Section 404 grants the Secretary of the Army exclusive authority to issue Section 404 permits for the discharge of "dredged or fill" material into navigable waterways at "specified disposal sites." 33 U.S.C. § 1344(a). The Secretary of the Army has delegated this authority to the Corps, which may issue Section 404 permits after notice and an opportunity for public hearings and after undertaking a public interest analysis. *See* 30 C.F.R. § 325.2(a).

30.     Only the Corps can specify a disposal site for dredge or fill material. In specifying "***each such disposal site***" for "***each such permit***" under Section 404, the Corps applies guidelines jointly developed with EPA (the "404(b)(1) Guidelines"). *See* 33 U.S.C. § 1344(b) (emphasis added). The 404(b)(1) Guidelines are codified at 40 C.F.R. Part 230 and focus primarily on the protection of aquatic resources. The 404(b)(1) Guidelines require project applicants to: (1) avoid discharges to waters of the United States if a practicable alternative to the discharge exists, 40 C.F.R. § 230.10(a); (2) minimize potential adverse impacts of discharges

that cannot be avoided, *id*. § 230.10(d); and (3) offset environmental losses resulting from unavoidable impacts through compensatory mitigation. *Id*. § 230.93(a).

31.     The Corps' permitting regulations specifically require applicants to design projects to avoid (if possible) and otherwise to minimize adverse impacts to aquatic resources, and then provide mitigation for any unavoidable impacts. 33 C.F.R. § 332.1(c)(2).

32.     As explained by the Corps: "Mitigation is an important aspect of the review and balancing process on many Department of the Army permit applications. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resources losses." 33 C.F.R. § 320.4(r)(1). The Corps will issue a permit for a project only if it complies with these requirements.

33.     The Corps signed a Memorandum of Agreement with EPA in 1992 (the "404(q) MOA") as required under CWA Section 404(q). *See* 33 U.S.C. § 1344(q). Section 404(q) directs the Corps to coordinate with the appropriate federal agencies, including EPA, "to assure that, to the maximum extent practicable, a decision with respect to an application for a permit . . . will be made not later than the ninetieth day after the date the notice for such application is published." 33 U.S.C. § 1344(q). The stated purpose of the 404(q) MOA is to "[e]stablish policies and procedures to implement Section 404(q) of the Clean Water Act to 'minimize, to the maximum extent practicable, duplication, needless paperwork and delays in the issuance of permits.'" The 404(q) MOA recognizes that EPA plays an "important role" in the Corps' Section 404 permitting process and envisions that EPA will provide comments to the Corps regarding compliance with the Clean Water Act and other relevant statutes, regulations, and policies.

34.     As part of their permitting authority, Corps district engineers may add conditions to permits when such conditions are necessary to satisfy legal or public interest requirements. Permit conditions must be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable.  33 C.F.R. § 325.4(a).

35.     In addition to issuing permits, the Corps has the authority to modify, suspend, or revoke permits.  33 C.F.R. § 325.7.  The Corps is also responsible for enforcing compliance with the terms of a Section 404 permit.  33 U.S.C. § 1344(s).

**B.     Congress Restricted EPA's Role In Section 404 Permitting.**

36.     EPA's role in permitting the discharge of dredged or fill material is limited.  EPA may provide comments to the Corps on proposed Section 404 permits in response to the Corps' notice of a proposed permit.  *See* 33 U.S.C. § 1344(a); *see also* 33 C.F.R. § 325.2(d).

37.      The Corps applies guidelines that it jointly developed with EPA when determining whether the use of a disposal site for dredged or fill material can be permitted under Section 404(a).  *See* 33 U.S.C. § 1344(b); *see also* 40 C.F.R. part 230.

38.     Finally, Congress gave EPA the authority, under defined circumstances, to veto the Corps' issuance of a Section 404 permit for a specified disposal site.  *See* 33 U.S.C. § 1344(c).  In the past, EPA exercised this authority sparingly.  The agency has issued only thirteen final Section 404(c) vetoes in the entire history of the CWA.  EPA has never issued a veto before the Corps conducted a review of the project.

**C.     Congress Limited EPA's Authority Under Section 404(c).**

39.     Section 404(c) grants EPA's authority to veto permits to be issued by the Corps under Section 404(a).  *See id.*  Section 404(c) authorizes the EPA Administrator to:

prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and [s]he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever [s]he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

33 U.S.C. § 1344(c).

40.    In order for EPA to determine that proposed discharges "will have an unacceptable adverse effect," the Agency must know, at a minimum, what types of materials would be discharged into waters of the United States, in what quantities those materials would be discharged, the location(s) of the proposed discharges, and their likely impacts.  Indeed, EPA has recognized that "where likely adverse impacts cannot be identified, 404(c) will not be used."  44 Fed. Reg. 58,076, 58,077 (Oct. 9, 1979).

41.    Section 404(c) expressly limits EPA's veto authority to the "defined area."  Likewise, the statute allows EPA to exercise that veto only when it has concluded that the discharge of "such materials" will have an unacceptable adverse impact.  The "defined" disposal site and "such" materials are those described by the Corps in response to a permit application. 33 U.S.C. § 1344(c).

42.    The statute also requires that EPA consult with the Corps before EPA makes a final determination under Section 404(c).  *See* 33 U.S.C. § 1344(c).

43.    Section 404's legislative history confirms the plain language of the statute, emphasizing that Congress intended that EPA may exercise its 404(c) authority only with respect to those specific disposal sites and fill materials proposed for permitting by the Corps.

44. EPA's regulations set forth detailed procedures governing the exercise of the Agency's Section 404(c) authority. *See* 40 C.F.R. pt. 231. If the Regional Administrator believes that an unacceptable adverse effect will result from the specification of a defined area for the disposal of identified dredged or fill material, the Regional Administrator will notify the Corps, the owner of the site, and the permit applicant ("if any") of the intent to issue a proposed Section 404(c) veto. *See id.* § 231.3(a). The Regional Administrator must provide a period for interested parties to comment on the proposed determination. *See id.* § 231.4(a). Following the comment period, the Regional Administrator must either withdraw the proposed determination or forward a recommended veto decision to the EPA Administrator. *See id.* § 231.5. The EPA Administrator must then consult with the Corps, the site owner, and the permit applicant and make a final decision affirming, modifying, or rescinding the recommended veto determination. *See id.* § 231.6.

45. EPA's regulations, however, purport to authorize EPA to "prohibit the specification of a site under section 404(c) with regard to any existing or potential disposal site *before* a permit application has been submitted[.]" 40 C.F.R. § 231.1(a) (emphasis added). Until now, however, EPA has never applied this provision to a project that has not been evaluated by the Corps.

## FACTUAL BACKGROUND

### I. The Pebble Claims

46. Pebble Partnership holds the mineral claims that comprise the Pebble deposit, which is located 200 miles southwest of Anchorage and 15 miles north of Lake Iliamna in the Bristol Bay watershed, in the Nushagak and Kvichak River watersheds.

47.     The Pebble deposit is located on land owned by the State of Alaska in the Lake and Peninsula Borough.  As described above, the State acquired this land for resource development in a bargained-for exchange with the federal government.  This land has been designated by the State for mineral development.

48.     The Pebble deposit underlies lands that comprise a tiny fraction of the Bristol Bay watershed.  The Bristol Bay watershed is approximately 108,780 $km^2$ in area, the combined Nushagak and Kvichak River watersheds are 59,570 $km^2$, the local watersheds surrounding the deposit are 1,036 $km^2$, and the footprint of EPA's largest "mine scenario" is a mere 88 $km^2$.

49.     The Pebble deposit area is isolated and sparsely populated.  The nearest communities—Iliamna, Newhalen, and Nondalton—are located between 17 and 19 miles away.  The vast Lake and Peninsula Borough has a population of 1,631 (according to the 2010 census) and the second lowest population density of any county-equivalent in the United States.

50.     The State manages its lands for specific development and recreational uses.  A combination of the Department of Natural Resources, the Department of Fish and Game, and the Department of Environmental Conservation has conducted land-use planning for the area of the Pebble deposit.  Since at least 1984, this area has expressly been open for mineral development.  *See* 1984 Bristol Bay Area Plan at 2-21-23.[4]  Indeed, the State had designated the area of the Pebble deposit primarily for minerals and designated nearby areas as having a secondary use designation for minerals.  More recently, in 2005, these same state agencies noted that "[t]he State selected much of the land in the planning area because of its mineral potential, as well as its

---

[4] Available at http://dnr.alaska.gov/mlw/planning/areaplans/bristol/index.htm (last accessed May 21, 2014).

potential for oil and gas, agriculture, and its recreation and wildlife values . . . If a deposit proves

economic for development, state and federal regulations and additional stipulations determined

through the permitting process, will ensure that other resource values are protected." 2005

Bristol Bay Area Plan at 2-31.[5]

A.      **Economic Impact of a Pebble Mine Project**

51.     Based on a 2010 mineral resource estimate, including inferred resources, the

Pebble deposit is estimated to contain 80 billion pounds of copper, 5.6 billion pounds of

molybdenum, and 107.4 million ounces of gold. The deposit is the largest undeveloped

porphyry copper body in the world. The IHS Global Insight study predicts that a Pebble mine

could contribute $64 billion to the U.S. Gross Domestic Product over the initial 25 years of

production.

52.     The IHS Global Insight study predicts that a Pebble mining project will generate

approximately 4,725 jobs during a five-year construction phase and approximately 1,220 direct

jobs and 14,715 total jobs (includes direct, indirect, and induced) during operations. Such a

mining project will generate approximately $136 to $180 million in annual taxes and royalties to

the State. Total federal, state, and local government revenues are projected to be $330 million to

$378 million annually.

B.      **Environmental Stewardship for a Pebble Project**

53.     Pebble Partnership has spent approximately $150 million conducting

environmental studies of the Pebble deposit area. The Partnership has publicly committed that it

_____

[5] Available at http://dnr.alaska.gov/mlw/planning/areaplans/bristol/index.htm (last accessed May
21, 2014).

will not proceed with any mining project in the area that would not safeguard Bristol Bay's ecological resources, including, above all, the salmon fishery. It has not yet determined, however, the project it would propose in a permit application to the Corps.

54.     Since 2004, the Pebble Partnership has undertaken comprehensive environmental and socioeconomic baseline studies. The Pebble Partnership has used these studies to prepare an Environmental Baseline Document ("Environmental Baseline") that serves as a critical component for developing a final mining plan. The Environmental Baseline provides an understanding of the environmental characteristics of the area today. The baseline studies encompass the Pebble deposit area, the potential transportation corridor to Cook Inlet, the marine environment in the area of the port sites, and the broader project region.

55.     The numerous studies involved in the Environmental Baseline have resulted in an immense database that—in characterizing the climate, surface and groundwater hydrology, wetlands, terrestrial wildlife habitat, fish and aquatic habitat, and marine habitat—will guide project planning. The Environmental Baseline represents one of the most comprehensive environmental study programs ever undertaken for a natural resource project in Alaska. It contains approximately 27,000 pages of data and analysis, divided into 53 chapters plus appendices.

56.     The Environmental Baseline will be used to support engineering design, and to provide information for the permitting and National Environmental Policy Act processes for any eventual project, in order to minimize and mitigate environmental impacts.

## II.     EPA's 404(c) Veto Proceeding

57.     On February 28, 2014, EPA Region 10 Administrator Dennis McLerran sent a letter that triggered a veto proceeding under CWA Section 404(c) for "discharges of dredged and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. U.S. EPA, Case No. 3:14-cv-_____*
Page 18 of 26

Case 3:14-cv-00097-HRH   Document 1   Filed 05/21/14   Page 18 of 26

fill material associated with mining the Pebble deposit." Administrator McLerran wrote that "[t]he Agency is taking this step because it has reason to believe that porphyry copper mining of the scale contemplated at the Pebble deposit would result in significant and unacceptable adverse effects to important fishery areas in the watershed." Ex. 1.

58.     According to the press release issued by Region 10 the same day as Regional Administrator McLerran's letter, the decision to undertake the Section 404(c) veto proceeding was "requested by EPA Administrator Gina McCarthy."[6]  This EPA press release also states that, "During this process, the [Corps] cannot approve a permit for the [Pebble] mine."

59.     On the same day that Regional Administrator McLerran sent his letter, State of Alaska Attorney General Michael Geraghty sent a letter in reply.  The State requested that EPA toll the time for Alaska to respond to EPA's notice.  Attorney General Geraghty wrote that, without an actual mining application, it is impossible to develop information about mitigation, and that "[t]he State and federal permitting review process of an actual proposed project is essential to the State's ability to respond" to EPA's environmental concerns, or to know what "corrective action" would be necessary.  As Attorney General Geraghty pointed out in his letter, until the permitting process is complete, regulators cannot know the content of the actual project or its potential environmental impacts.

60.     Pebble Partnership has informed EPA in formal written comments submitted in July 2012 that the Clean Water Act does not authorize a veto proceeding in the absence of a permit application, and that such a proceeding would conflict with the Alaska Statehood Act.

––––––––––––––––––––

[6] Available at http://yosemite.epa.gov/opa/admpress.nsf/names/r10_2014-2-28_bristol_bay (last accessed May 21, 2014).

EPA's launch of this veto proceeding rejects these legal objections. Under well-settled principles of administrative law, the Pebble Partnership is not required to engage in a futile effort to convince EPA of a position it has already rejected.

61.     Indeed, EPA's 404(c) veto proceeding prohibits the specification of *any* lands for the discharge of dredged and fill material "associated with mining the Pebble deposit in southwest Alaska." EPA's decision has the immediate effect of depriving the Corps of the authority to consider a Section 404 permit application for such activities.

## CLAIMS FOR RELIEF

### COUNT I

### EPA Exceeded Its Authority by Applying its Veto Regulation in the Absence of a Permit Application to the Corps and the Corps' Review.

62.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 61 of this Complaint, as though fully set forth below.

63.     On February 28, 2014, EPA announced the veto proceeding under CWA Section 404(c) for the Pebble deposit. By this decision, EPA has—for the first time—applied its regulation purporting to authorize EPA to veto a Section 404 permit in the absence of Corps review of a permit application.

64.     Before the Corps reviews an application for a Section 404 permit for the Pebble project, EPA cannot lawfully exercise its authority under Section 404(c) to veto the specification of disposal sites "associated with mining the Pebble deposit in southwest Alaska."

65.     CWA Section 404(a) grants authority to the Corps to "issue permits . . . for the discharge of dredged and fill material . . . at specified disposal sites." 33 U.S.C. § 1344(a).

66. Only the Corps—not EPA—can specify a disposal site for a Section 404 permit. "[E]ach such disposal site shall be specified for each such permit" by the Corps through the application of the 404(b)(1) Guidelines. *Id.* § 1344(b).

67. EPA is authorized to "prohibit the specification . . . of any defined area as a disposal site" if it determines "that the discharge of ***such materials*** into ***such area*** will have an unacceptable adverse effect" on certain resources. *Id.* § 1344(c) (emphasis added).

68. Section 404(c)'s references to "such" a defined area as a disposal site and "such" dredged and fill materials pertain to those areas and materials that are the subject of a particular Corps permitting decision under Section 404(a). Thus, EPA cannot exercise its authority under Section 404(c) outside of the context of permitting where the Corps has specified a disposal site and the materials proposed to be discharged.

69. No permit application had been submitted for any discharges of dredged or fill material "associated with mining the Pebble deposit." Thus, no defined area has been specified by the Corps as a disposal site and no materials have yet been proposed to be discharged.

70. Interpreting Section 404(c) to allow EPA to ban any mining of the Pebble deposit would conflict with the Clean Water Act. The Act, by its own terms, "preserve[s]" the "primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251. Congress did not intend that EPA use Section 404(c) to implement zoning restrictions over vast swaths of land.

71. Section 231.1(a) of 40 C.F.R. is a final regulation resulting from final agency action. EPA has applied the regulation to commence a veto proceeding in the absence of action by the Corps for the first time in the 30 years since the regulation was promulgated. With the

Section 404(c) veto proceeding, EPA has applied its regulation to completely preempt the Corps' permitting process. This regulation, as applied to the Pebble deposit, is subject to review before this Court.

72.     EPA has preempted a permitting process designed to develop an administrative record that sets forth, with precision, the anticipated "discharge" and "area" of discharge. Assuming a permit application is eventually submitted, the permitting agency (the Corps) has the prerogative to deny it, rendering the EPA veto proceeding completely unnecessary. More importantly, the permitting process allows the State and the Corps to analyze a concrete proposal, to impose limitations, to consider alternatives, and to evaluate, in detail, the environmental impacts associated with the requested permit through the EIS process under the National Environmental Policy Act.

73.     If the EPA veto proceeding is allowed to upend the permitting process, the entire administrative process will be eviscerated. There will be no concrete proposal, no specification of "such materials" or "such area," no consideration of alternatives, no conditions imposed by a permitting agency, and no mitigation requirement. Neither the Corps nor the State will be able to bring their expertise to bear.

74.     Thus the veto proceeding being conducted by EPA is not equivalent to a veto proceeding for an actual permit proposed by the Corps. Neither is it a veto proceeding authorized by Congress under Section 404(c).

75.     No environmental protection benefit would accrue from disruption of the normal Section 404 permitting process. No "unacceptable adverse effect" can occur while the Pebble Partnership decides if and when it will submit an application for a permit, and the Corps decides

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. U.S. EPA, Case No. 3:14-cv-_____*
Page 22 of 26

Case 3:14-cv-00097-HRH   Document 1   Filed 05/21/14   Page 22 of 26

what project, if any, merits approval.  Until EPA is presented with an actual proposed project, the

Agency certainly can have no fear of any environmental effect at all, much less an "unacceptable

adverse effect."  Hence, there is no environmental justification for initiating a proceeding that

will upend the permitting process.

76.     Accordingly, EPA's decision to initiate the Section 404(c) veto proceeding is

contrary to the CWA and should be set aside under 5 U.S.C. § 706(2).

## COUNT II

### EPA's Initiation of The 404(c) Veto Proceeding Violates The Alaska Statehood Act and The Cook Inlet Exchange Legislation.

77.     Plaintiff incorporates by reference the allegations contained in paragraphs 1

through 76 of this Complaint, as though fully set forth below.

78.     An EPA Section 404(c) veto of the Pebble project would violate the Alaska

Statehood Act and the Cook Inlet Exchange legislation.  A veto would be an unlawful revocation

of Alaska's right under the Statehood Act to select and to develop minerals on these lands.  EPA

also has abrogated the State's bargain with the federal government, ratified in the Cook Inlet

Exchange legislation.  The veto proceeding is an assertion by EPA of the right to

administratively annul the Statehood Act and retract the benefits of the Cook Inlet Exchange.

79.     Both the Statehood Act and the Cook Inlet Exchange legislation explicitly provide

Alaska with the right to manage its lands for economic development purposes.  The Statehood

Act represents a bargained-for promise to the State of Alaska from the federal government.  *See*

Statehood Act § 6(i).  The Statehood Act clarified that "[a]ll grants made or confirmed . . . shall

include mineral deposits."  *Id.*  Thus, the State reserved the rights to "all the minerals in the lands

. . . together with the right to prospect for, mine, and remove the same." *Id*. The State is free to lease those mineral deposits as its legislature may direct. *See id*.

80.     In this proceeding, EPA has arrogated to itself the authority to dictate the use of Alaska State land in a manner contrary to the express determination of the State. EPA's action would not merely regulate mining; it would ban mining on property selected and managed by the State for that very purpose.

81.     EPA's action thus abrogates the State's right, under the Alaska Statehood Act, to determine the use of its lands, including the mineral deposits, and to generate revenue to fund the State government.

82.     The Cook Inlet Exchange legislation represents a bargained-for promise to the State of Alaska from the federal government. The federal government resolved a dispute with Native corporations and completed land-holdings for the Lake Clark Preserve. The State gave up valuable mineral lands and exchanged them for other lands—that had been previously withdrawn by the federal government—that also had mineral potential. Congress ratified the terms of the Cook Inlet Exchange by enacting Pub. L. 94-204 (an amendment to ANCSA). EPA's veto proceeding destroys this congressionally approved bargain.

83.     Under the terms of the Cook Inlet Exchange, the State obtained "all right, title, and interest of the United States" in the lands that are now the subject of EPA's Section 404(c) veto proceeding. The Exchange legislation specified that the State obtained its interest in the lands containing the Pebble deposit "as if conveyed to the State under and pursuant to Section 6 of the Alaska Statehood Act." Pub. Law 94-204 § 12(d)(1), 89 Stat. 1153; 43 U.S.C. § 1611

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. U.S. EPA, Case No. 3:14-cv-_____*
Page 24 of 26

Case 3:14-cv-00097-HRH   Document 1   Filed 05/21/14   Page 24 of 26

note.  The State has the right under the Statehood Act to allow the development of mineral deposits in its lands for the purpose of generating revenue for the State.

84.     The Cook Inlet Exchange thus reflects a conscious choice by Congress to convey ownership of the Pebble lands, including the right to use these lands for mineral development, to the State.  In exchange, the federal government received from the State lands that would settle Native claims and permit consolidation of landholdings in what is now a national park and preserve.  By initiating the veto proceeding, EPA has unlawfully annulled the federal end of the bargain and revoked the State's congressionally authorized power to allow mineral development on these state-owned lands.

85.     Accordingly, the initiation of the Section 404(c) veto proceeding violates the Statehood Act, Cook Inlet Exchange legislation, and other federal law.  EPA's decision should be set aside pursuant to 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Pebble Partnership respectfully requests that this Court enter judgment in its favor, and:

A.     Declare that EPA's regulation at 40 C.F.R. §231.1(a), authorizing a Section 404(c) veto in the absence of a permit application, violates federal law;

B.     Declare that, as applied through conducting this veto proceeding, the regulation at 40 C.F.R. §231.1(a) violates federal law;

C.     Vacate EPA's decision to conduct the Section 404(c) veto proceeding in its entirety;

D.	Enjoin and restrain Defendants from enforcing, applying, or implementing the decision to conduct the Section 404(c) veto proceeding; and

E.	Grant Pebble Partnership such other relief as may be necessary and appropriate or as the Court deems just and proper.


**DATED**:  May 21, 2014

Respectfully submitted,

CROWELL & MORING LLP

/s/ Kyle W. Parker
Kyle W. Parker, ABA 9212124
Jonathan W. Katchen, ABA No. 0411111
CROWELL & MORING LLP
1029 West 3rd Avenue, Suite 550
Anchorage, Alaska 99501
Telephone:  (907) 865-2600
Facsimile:  (907) 865-2680
kparker@crowell.com
jkatchen@crowell.com

Richard E. Schwartz, *Pro Hac Vice* application pending
John C. Martin, *Pro Hac Vice* application pending
Susan M. Mathiascheck, *Pro Hac Vice* application pending
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

*Attorneys for Plaintiff Pebble Limited Partnership*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. U.S. EPA, Case No. 3:14-cv-_____*
Page 26 of 26

Case 3:14-cv-00097-HRH   Document 1   Filed 05/21/14   Page 26 of 26